UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MOTOR TANKER *BELLA 1* BEARING INTERNATIONAL MARITIME NUMBER 9230880,<br><br>Defendant. | Civ. A. No. 1:26-cv-00992 (RBW) (ZMF) |

**GOVERNMENT'S STATUS REPORT**

The United States respectfully submits this Status Report in response to Burevestmarin LLC's ("Burevest") Status Report (D.E. 38), dated November 4, 2026. As with previous assertions it has made to this Court, Burevest's latest cynical contentions are unfounded.

**A. Factual Updates**

On October 26, 2026, at the Court's direction, the United States obtained and provided to the Court and Burevest an update from Global Marketing System Inc. ("GMS") on the *BELLA 1*'s then-current location, estimated arrival at port, and timeline for the commencement of the vessel's recycling operation. As the United States explained, the information it received indicated that the *BELLA 1* was "slated to arrive at Outer Port Limits of Chittagong (Bangladesh) 4 p.m. local time on Oct. 27, 2026" and "likely to be on the beaching yard within Nov. 7th – Nov. 12th 2026" with "[the] actual recycling operation . . . expected to start within 20 to 30 days after beaching, once all local formalities and customs formalities are completed by the recycler."

To the Government's knowledge, the above timeline remains accurate. GMS has advised the Government that the *BELLA 1* arrived at Chittagong Inner Anchorage on November 4, 2026. Claimant appears to suggest that this arrival deviates from its prior estimated timeline. It does not. From the Inner Anchorage, the Government understands, the vessel must still transit to the beaching yard itself for scrapping. Thus, based on updates to date, the vessel's arrival at the Inner Anchorage remains consistent with the approximate schedule previously provided in anticipation of its beaching and recycling.

While the *BELLA 1*'s posture has remained largely unchanged, Burevest's has not. Indeed, in its November 4, Status Report, Burevest fails to report that it initiated legal proceedings *this week* in Bangladesh seeking arrest of the *BELLA 1*, asserting ownership over it, and claiming millions of damages, in an attempt to interfere with GMS's lawful possession and disposal of the vessel that GMS purchased in accordance with this Court's interlocutory sale order and in compliance with U.S. sanctions. *See* Exhibit 1, Application for Arrest of the Vessel M.T. ERA (IMO 9230880).[1] As the United States has explained in prior briefing, Burevest's motions attacking the interlocutory sale are untimely and unwarranted. Nonetheless, under the auspices of seeking to preserve the Court's ability to adjudicate its motion to undo the interlocutory sale [D.E. 8], Burevest's counsel has beseeched the Court with serial requests for very granular information about the vessel's exact location and point-to-point timelines. It now appears those inquiries may have been intended, at least in part, to enable Burevest to mount an ancillary attack on these proceedings and this Court's orders in a foreign court. Burevest's failure to advise this Court of

[1] On November 5, 2026, GMS informed the United States of Burevest's initiation of Admiralty Suit No. 44 of 2026 in the Supreme Court of Bangladesh, High Court Division, *Burevestmarin versus M.T. ERA (IMO 9230880), et al.,* and provided a copy of the application for arrest attached as Exhibit 1. The precise date when the action was commenced is unclear because it is undated.

its actions in Bangladesh in its November 4 Status Report, further supports a conclusion that Burevest may have sought to obtain information through the Court's judicial process to further its effort to seize the vessel back for itself.

Further, it appears that Burevest planned for and took this Bangladeshi arrest action, involving blocked property in the possession or control of GMS (a U.S. person), without authorization from the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"). As counsel for Burevest stated in his email to this Court on October 29, 2026, other parties wishing to engage in dealings with the *BELLA 1* and who were not operating pursuant to the OFAC licenses issued to the U.S. Department of Justice or to GMS need authorization from OFAC to engage in such dealings. For all of its professed concern about other entities' compliance with OFAC licensing requirements, Burevest itself has not obtained one. Burevest's failure to obtain an OFAC license reveals a disdain for U.S. sanctions and is consistent with its past practices as the purported owner of dark fleet vessels illicitly operating for the benefit of sanctioned entities and countries and to the detriment of U.S. national security and foreign policy objectives. Despite these actions, Burevest again seeks equitable relief from this Court with unclean hands, seeking to leverage the Court's authority while it attempts to wrest control of the vessel from GMS through other means.

**B. Sale Price of the Vessel**

Burevest also erroneously asserts that "the purported sale of the Vessel by GMS for a scrap value of nearly $21 million confirms that, even if the Vessel only had value as scrap[,] the $9.1 million price of the Government's sale of the Vessel to GMS was a grossly unreasonable price at which to attempt the Government's fire sale." Claimant's Status Report at 2 (parentheticals and other clauses omitted). Once again, Burevest mis-states the facts and draws incorrect conclusions.

As the Government previously informed Burevest and the Court (D.E. 28-1 at ¶ 3), after purchasing the vessel for $9.1 million, GMS had already spent an additional roughly $9 million as of October 26 preparing the vessel for scrapping, including "cleaning of solid sludge from its tanks." This cleaning greatly increased the vessel's scrap value – as one might expect, clean metal has a much greater scrap value than sludge-coated metal. Burevest ignores the millions of dollars in GMS expenses for cleaning, transporting the vessel to Bangladesh for scrapping, or other costs. Thus, the delta between the price GMS paid for the vessel and the price GMS sold it for was a result of GMS's own financial investment in scrapping the vessel. It does not remotely suggest that the sale to GMS was a below-market "fire sale." [2]

Further, many variables impact what the market is willing to pay for vessels in the condition of the *BELLA 1*. Those include but are not limited to the vessel's history, condition, insurance, and maintenance, as well as various foreign, political, and economic factors. The fact that the market dictated a price which differs from a claimant's unsupported valuation months after the sale is of little value. The market dictated the price at the time of the sale.

**C. Transfers of Possession, Control, or Ownership**

Burevest's repeated allegations that the sale of the *BELLA 1* to GMS was accomplished without authorization from OFAC are false.

On December 20, 2025, the Department of Justice received a license from OFAC authorizing the Department and "all U.S. persons and U.S.-owned or -controlled foreign entities acting on behalf of, in support of, or at the direction of" the Department to engage in broad dealings related to vessels blocked under several U.S. sanctions programs, including the *BELLA 1*. Among

[2] Even the documents Burevest exhibits to its Status Report suggests such investments were made. *See, e.g.,* D.E. 38-1 at 11-12 (buyer to deliver the vessel to the scrapper in Bangladesh and provide various certifications, including for safe entry and hot works.).

the actions authorized under this license were all transactions necessary to effectuate the "transfer" or "any other disposition" of any blocked vessel seized by the Government. Pursuant to this authorization and the interlocutory sale order, the Department sold the *BELLA 1* to GMS and GMS, working "in support of" the Government's efforts to disposition the vessel, operated pursuant to this authorization until August 2026.

In or around the time that the vessel got underway on its final voyage for scrapping, GMS applied for its own license from OFAC, which OFAC issued on August 8, 2026 and pursuant to which GMS has been operating since its issuance. GMS's OFAC license is narrowly focused on authorizing transactions necessary to accomplish the scrapping of the vessel.

Burevest repeatedly inveighs, in ***bold italicized*** text, that the steps GMS has taken to proceed with scrapping stand at odds with the Government's representations and the bounds of the license described above. This overreaches. First, as practical matter, it is hard to imagine what process Burevest envisions for scrapping a vessel that does not involve, in some fashion, eventually transferring "physical possession or control" of the vessel to the entity doing the scrapping. *See* Claimant's Status Report at 2 (protesting that "[the] documents leave ambiguous whether physical possession or control of the Vessel has already transferred to" the recycler). And the Government, as Burevest itself notes in its Status Report, said as much in its November 2, 2026 email to the Court: "As for the scrapping itself, GMS has advised that per routine practice, the recycler, not GMS, will maintain control over the actual recycling operation."

More notably, however, the documents Burevest attaches to its Status Report underscore the limited nature of the transaction described therein. Assuming the documents represent what Burevest purports (a "Memorandum of Agreement" between GMS and a recycler, plus related records), they are replete with admonitions that the transaction is permitted for one purpose only:

scrapping. *See* Claimant's Status Report Ex. 1, at 9 ("Buyers have confirmed acceptance of the vessel without inspection and the sale is therefore outright, definite and only for guaranteed demolition purpose subject to terms, conditions and exceptions of this contract."), 14 ("The vessel is sold for guaranteed demolition purpose only and Buyers shall furnish Sellers with a certificate for demolition in due course if Seller requires so."); and 18 ("“We have the honor to inform you that the above vessel has been sold . . . for scrapping purpose only.").

In short, Burevest's latest filing amounts to another attempt to manufacture an emergency after months of its own inaction.

Dated: November 6, 2026
Washington, D.C.

Respectfully Submitted,

Jeanine Ferris Pirro
United States Attorney

By: *____/s/ Rajbir Datta___________*
Rajbir Datta
N.Y Bar 5206073
Assistant United States Attorney
National Security Section
U.S. Attorney's Office
District of Columbia
601 D Street, N.W.
Washington, D.C. 20579
(202) 252-7687
Rajbir.Datta@usdoj.gov

John Eisenberg
Assistant Attorney General
National Security Division

By: *__/s/ Sean Heiden___________*
Sean Heiden
D.C. Bar 1617636
Deputy Chief

Counterintelligence and Export Control
Section, National Security Division
Sean.heiden2@usdoj.gov

Margaret A. Moeser
Chief
Money Laundering, Narcotics and Forfeiture Section, Criminal Division
U.S. Department of Justice

By: __/s/ *Joshua L. Sohn*____________________
Joshua L. Sohn
S. Chartey Quarcoo
Trial Attorneys
Joshua.sohn@usdoj.gov